# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 21-0346V

|  |  |
|---|---|
| CASSANDRA HAMILTON, | Chief Special Master Corcoran |
| Petitioner, | Filed: June 14, 2023 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | Special Processing Unit (SPU); Decision Awarding Damages; Pain and Suffering; Influenza (Flu) Vaccine; Shoulder Injury Related to Vaccine Administration (SIRVA) |
| Respondent. | |

*Brynna Gang, Kraus Law Group, LLC, Chicago, IL, for Petitioner.*

*Martin Conway Galvin, U.S. Department of Justice, Washington, DC, for Respondent.*

### DECISION AWARDING DAMAGES[1]

On January 8, 2021, Cassandra Hamilton filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered a left shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine received on March 13, 2020. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters. Respondent conceded entitlement, but the parties have been unable to agree on the appropriate amount of damages.

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount of **$60,000.00 for actual pain and suffering.**

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website , and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

## I.       Relevant Procedural History

This case was activated on April 28, 2021 (ECF No. 14). When Respondent had not determined how he intended to proceed in this case a year later, pursuant to my "one year rule" Petitioner was permitted to file a motion for a ruling on the record on May 10, 2022 (ECF No. 31). Petitioner's motion addressed both entitlement to compensation and the amount of damages she deemed appropriate.

On July 25, 2022, Respondent reacted to Petitioner's motion and submitted a Rule 4(c) Report (ECF No. 33). Respondent conceded that Petitioner was entitled to compensation, and while he objected to briefing damages before entitlement was resolved, Respondent nonetheless addressed damages.

On February 23, 2023, a ruling was entered determining that Petitioner is entitled to compensation (ECF No. 34). The parties were directed thereafter to negotiate damages (ECF No. 35). However, because the parties represented that such discussions were not likely to be fruitful (ECF No. 36), Petitioner requested that I make a decision on damages based on the parties' existing briefing. The matter of damages is now ripe for resolution.

## II.      Relevant Medical History

On March 13, 2020, Petitioner received a flu vaccine intramuscularly in her left deltoid at CVS. Ex. 5 at 3. Three weeks later, on April 3, 2020, Petitioner had a phone consultation with Dr. Wassim Younes for left shoulder pain. Ex. 4 at 3-4. Petitioner reported pain and limited range of motion for three weeks. *Id.* at 4. Dr. Younes assessed her with pain in her left shoulder post flu injection suspected to have been injected into her bursa. *Id.* He recommended that she be seen by an orthopedist and have an x-ray and ultrasound. *Id.*

Three days later, Petitioner had a telemedicine visit via phone with orthopedist Dr. Lucas Buchler. Ex. 1 at 61. Petitioner reported a three week history of left shoulder pain following a flu shot on March 13, 2020. *Id.* She reported that the injection location was high, and that she had an immediate onset of pain and limited motion. *Id.* Her pain was worse with movement and overhead activity, and woke her at night. *Id.* She was taking 600 mg of ibuprofen two to three times a day, with minimal relief. *Id.* Because the visit was done by phone, there was no examination. *Id.* at 64. Dr. Buchler determined that her history was concerning for rotator cuff tendinopathy or subacromial bursitis, and ordered an MRI. *Id.*

Three days after her orthopedist appointment (April 9th), Petitioner underwent a left shoulder MRI. Ex. 3 at 7. The MRI revealed a strain of the infraspinatus tendon, with

2

a partial thickness tear of the infraspinatus tendon. *Id.* Intramuscular strain of the infraspinatus muscle was also noted. *Id.* There was no joint effusion or fluid within the subacromial/subdeltoid bursa. *Id.* Dr. Buchler called Petitioner with the MRI results the next day, on April 10th, and recommended non-surgical treatment with oral anti-inflammatory medications and physical therapy. Ex. 1 at 39.

On April 14, 2020, Petitioner underwent a physical therapy ("PT") initial evaluation via telehealth for her left shoulder pain. Ex. 2 at 64. She reported very limited range of motion ("ROM"), and inability to sleep on her shoulder. *Id.* She had tried jogging but it was painful. *Id.* Her left shoulder active ROM was 100 degrees in flexion, 80 degrees in abduction, 60 degrees in extension, and 40 degrees in external rotation.[3] *Id.* at 65. She was assessed with marked loss of active ROM in all planes with increased pain. *Id.* at 66. Petitioner attended ten additional PT sessions via telehealth between April 16 and May 28, 2020. Ex. 2 at 41-62. She was discharged from PT on May 28th, reporting an 85% improvement in her symptoms since PT began. *Id.* at 41. She had improved active ROM in all planes, with pain at end ranges especially with abduction and external rotation. *Id.* at 42. She was directed to continue her home exercise program. *Id.*

On June 4, 2020, Petitioner returned to orthopedist Dr. Buchler. Ex. 1 at 19. She reported that her symptoms had improved, but she continued to have persistent left shoulder pain. *Id.* at 20. On examination, her left shoulder ROM in forward elevation was 170 degrees (active) and 180 degrees (passive). *Id.* Her ROM in external rotation was 60 degrees. *Id.* She exhibited positive Hawkins impingement signs, and negative Neer impingement signs. *Id.* She had positive liftoff signs, and negative signs on the belly press, speeds, Yergason, bicep stretch, O'Brien's, and cross body compression tests. *Id.* She was tender to palpation in the subacromial space. *Id.* Dr. Buchler offered treatment options of either activity modification, oral anti-inflammatory medications and a return to PT, or a subacromial cortisone injection with a return to PT. *Id.* at 21. Petitioner opted to try a short course of oral anti-inflammatories with PT. *Id.*

Petitioner returned for a second round of PT via telehealth beginning on August 10, 2020. Ex. 2 at 34. She reported that since her discharge from PT, her symptoms had remained stable, and had not improved despite continuing her home exercise program. *Id.* Her left shoulder active ROM was 165 degrees in flexion, 155 degrees in abduction, 70 degrees in external rotation, and within functional limits for internal rotation. *Id.* at 35. She exhibited minor limitations in active ROM, especially in end range elevation. *Id.* at

---

[3] Normal shoulder ROM for adults ranges from 165 to 180 degrees in flexion, 170 to 180 degrees in abduction, 50 to 60 degrees in extension, and 90 to 100 degrees in external rotation. Cynthia C. Norkin and D. Joyce White, MEASUREMENT OF JOINT MOTION: A GUIDE TO GONIOMETRY 72, 76, 80, 88 (F. A. Davis Co., 5th ed. 2016).

36. She also exhibited pain and weakness into shoulder elevation and external rotation with resisted strength testing. *Id.*

Petitioner attended a total of 20 PT sessions between August 10 and November 13, 2020, all via telemedicine. Ex. 2 at 10-35; Ex. 8 at 8-26. At discharge on November 13, she reported that her shoulder function was at about 90%, with minimal functional limitations. Ex. 8 at 24. She was experiencing only occasional low level pain with certain reaching movements. *Id.* Her strength was greatly improved, and she had pain free active ROM in all planes. *Id.* Her ROM was 165 in flexion and 160 degrees in abduction. *Id.* at 25. She was discharged from PT and directed to continue her home exercise program. *Id.* at 24.

On December 18, 2020, Petitioner was seen by Dr. Melissa Dugan Kim for a gynecological examination. Ex. 7 at 25. She reported that she continued to experience shoulder pain related to her flu vaccine. *Id.* It appears there was no further discussion or treatment related to her shoulder, and no further medical records have been filed.

### III.    Affidavit Evidence

Petitioner filed an affidavit in support of her claim. Ex. 6. In it, she maintained that before March 2020, she was very healthy and rarely needed medical care. *Id.* at ¶ 2. When she received the flu vaccine on March 13, 2020, she noticed the needle was placed high on her arm near her shoulder. *Id.* at ¶ 4. That evening, her left shoulder and arm were "extremely sore and painful," and she had difficulty sleeping. *Id.* at ¶ 5. She expected the soreness to ease over time, but instead the pain worsened over the next few days. *Id.* at ¶¶ 5-6.

Petitioner tried to manage her arm pain at home over the next few weeks. Ex. 6 at ¶ 8. She states that most of the time, the pain was at level ten on a scale of one to ten. *Id.* at ¶ 8. She experienced pain reaching, getting dressed, washing hair, or even grabbing a pen. *Id.* When she learned that her insurer had a telemedicine service, she made an appointment. *Id.* at ¶ 9. She then was able to consult with an orthopedist via telemedicine as well. *Id.* at ¶ 10.

After an MRI, Dr. Buchler recommended PT. Ex. 6 at ¶ 11. Her PT was conducted through video conferencing due to state stay at home orders related to the COVID-19 Pandemic. *Id.* at ¶ 12. With PT, her ROM improved, although she still had difficulty with certain movements, and her arm pain continued to wake her at night, though less frequently. *Id.* at ¶ 13.

A second round of PT was also performed remotely because the Pandemic was worsening. Ex. 6 at ¶ 15. By the late fall of 2020, she was no longer in constant pain but continued to have pain with certain movements. *Id*. at ¶ 16. With movements such as reaching overhead or behind her, or rotating her shoulder, her pain increased from one out of ten to three or four out of ten. *Id*. Over time, her progress plateaued, at which time she was discharged from PT. *Id*. at ¶ 17.

## IV.     The Parties' Arguments

Petitioner proposes an award of $75,000.00 in pain and suffering as the sole component of damages for her SIRVA. Petitioner's Memorandum in Support of a Ruling on the Record, filed May 10, 2022, at 10 (ECF No. 31) ("Br."). In support of her position, Petitioner cites *Decoretz* (awarding $75,000 in pain and suffering), *Kim* (awarding $75,000 in pain and suffering), and *Boyd* (awarding $80,000 in pain and suffering).[4]

Petitioner emphasizes that she sought care more quickly, and underwent significantly more PT sessions than the *Decoretz* petitioner. Br. at 12-13. Both petitioners had findings on their MRIs, and neither underwent additional interventions such as a steroid injection. *Id*. Petitioner also asserts that her period of more severe pain lasted longer than the *Decoretz* petitioner. *Id*. at 13. And Petitioner characterizes her injury as more severe than that of the *Kim* petitioner, with earlier intervention and almost three times as many PT sessions. *Id*. at 13-14. Petitioner views her injury as slightly less severe than *Boyd,* however, since that petitioner required further assessment more than three years after vaccination. *Id*. at 15.

Respondent proposes a pain and suffering award of $55,000.00. Respondent's Rule 4(c) Report and Response, filed July 25, 2022, at *6 (ECF No. 33) ("Opp."). Respondent relies on damages decisions in *Ramos* (awarding $40,000 in pain and suffering), *Norton* (awarding $55,000 in pain and suffering), and *Rayborn* (awarding $55,000 in pain and suffering).[5]

*Ramos* involved no surgery or steroid injections, treatment was limited to PT, and as here the claimant "improved within a few months." Opp. at 8. Respondent mistakenly

---

[4] *Decoretz v. Sec'y of Health & Human Servs.*, No. 19-0391V, 2021 WL 2346468 (Fed. Cl. Spec. Mstr. May 7, 2021); *Kim v. Sec'y of Health & Human Servs.*, No. 17-418V, 2018 WL 3991022 (Fed. Cl. Spec. Mstr. July 20, 2018); and *Boyd v. Sec'y of Health & Human Servs.*, No. 19-1107V, 2021 WL 4165160 (Fed. Cl. Spec. Mstr. Aug. 12, 2021).

[5] *Ramos v. Sec'y of Health & Human Servs.*, No. 18-1005V, 2021 WL 688576 (Fed. Cl. Spec. Mstr. Jan. 4, 2021); *Norton v. Sec'y of Health & Human Servs.*, No. 19-1432V. 2021 WL 4805231 (Fed. Cl. Spec. Mstr. Sept. 14, 2021); and *Rayborn v. Sec'y of Health & Human Servs.*, No. 18-226V, 2020 WL 5522948 (Fed. Cl. Spec. Mstr. Aug. 14, 2020).

asserts, however, that Petitioner underwent 20 PT sessions compared to 11 in *Ramos*, when the record in this case establishes that Ms. Hamilton attended a total of 31 PT sessions.

Respondent also asserts that this case is similar to *Norton*, since both petitioners sought care within a seven month span, and both made improvements within several months of starting PT. Opp. at 9. However, the *Norton* petitioner also received a cortisone injection, suggesting that a higher award would not be warranted in this case. *Id*. Finally, Respondent asserts that this case is similar to *Rayborn* in that both petitioners had 20 PT sessions, no surgery, and seven months of treatment. *Id*.

Respondent distinguishes the cases cited by Petitioner, noting that the *Decoretz* and *Boyd* petitioners continued treatment much longer than Petitioner, until 16 months and two and a half years after vaccination, respectively. Opp. at 10-11. Respondent also asserts that medical records  documented that the petitioners in *Decoretz, Kim*, and *Boyd* experienced severe pain, while Petitioner's records do not document such severe pain. *Id*.

## V.    Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4).

Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which the petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs*., No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs*., No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs*., No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (citing

*McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with that of my predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Human Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). That decision maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 589-90. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 593-95. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. *Graves* is not controlling of this case, but provides a reasoned way to evaluate pain and suffering awards.

## VI.    Appropriate Compensation for Petitioner's Pain and Suffering

The record reflects, and the parties do not dispute, that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

In this case, Petitioner's injury continued to require treatment for eight months until her discharge from PT in November 2020. A month later, she reported during an unrelated medical appointment that her pain continued, although she did not seek or receive treatment at that time. Thus, the record documents continued pain for nine months. By her May 28, 2020 PT discharge, 2.5 months after vaccination, she was 85% improved. Thus, she had substantial relief relatively quickly, with lingering milder restrictions.

As to the severity of Petitioner's injury, Petitioner's initial ROM deficits were "marked." Ex. 2 at 65. However, and as noted, she experienced improvement not long after. Although her medical records generally do not document pain levels, I note that Petitioner sought care within three weeks in the early days of the stay at home orders related to the COVID-19 Pandemic, suggesting some urgency and intensity to her pain levels. Overall, Petitioner's injury appears to fall on the milder side when compared to other compensated SIRVA cases. Her pain and ROM restrictions largely resolved within eight months with conservative care of 31 PT sessions and oral anti-inflammatories. It is apparent that Petitioner worked hard to aid her own recovery, having achieved a good outcome with PT done completely remotely.

I find that the best comparables cited by the parties are *Decoretz* and *Rayborn*. This case is similar to *Decoretz*, albeit with a shorter duration of symptoms. The *Decoretz* petitioner attended fewer PT sessions (17, compared to 31 in this case), but over a much longer period of time, seven months. In addition, the *Decoretz* petitioner was diagnosed with adhesive capsulitis. Although the *Decoretz* petitioner delayed seeking care longer than Ms. Hamilton, her injury continued, in mild form, for several months longer. *Rayborn* has relevance herein because the claimant in it, as here, experienced continued symptoms for approximately nine months. The *Rayborn* petitioner delayed seeking care for four months and had fewer PT sessions, but also had a cortisone injection.

**Given the foregoing, I find that $60,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering**.

## Conclusion

Based on consideration of the record as a whole,[6] **I award Petitioner a lump sum payment of $60,000.00 in actual pain and suffering, in the form of a check payable to Petitioner.**

The Clerk of Court is directed to enter judgment in accordance with this Decision.[7]

---

[6] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[7] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master